UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

ALVA E. BEARDSON,

       Plaintiff,

       v.

FRANCISCAN ALLIANCE, INC. d/b/a
FRANCISCAN HEALTH,

       Defendant.

CAUSE NO.: 2:20-CV-269-TLS

**OPINION AND ORDER**

This matter is before the Court on Defendant Franciscan Alliance's Motion for Summary

Judgment [ECF No. 40], which is fully briefed and ripe for ruling. For the reasons set forth

below, the Court GRANTS the Defendant's motion.

**PROCEDURAL BACKGROUND**

The Plaintiff Alva E. Beardson filed an Amended Complaint [ECF No. 26] against the

Defendant Franciscan Alliance, Inc., d/b/a Franciscan Health, bringing claims under Title VII of

the 1964 Civil Rights Act, 42 U.S.C. § 2000e, et seq. (Title VII), the Age Discrimination in

Employment Act, 29 U.S.C. § 621, et seq. (ADEA), and the Family Medical Leave Act, 29

U.S.C. § 2601, et seq. (FMLA).

Under Title VII, in Count I, the Plaintiff alleges race and color discrimination by the

Defendant when it (1) terminated her employment, (2) failed to promote her, (3) provided

unequal terms and conditions of her employment, and (4) retaliated against her. In Count IV, the

Plaintiff alleges that (1) the Defendant retaliated against her by terminating her employment

because she filed a Title VII claim with the EEOC for race-based discrimination on April 12,

2019, (2) the Defendant retaliated against her because she opposed discriminatory practices in

the workplace, and (3) the Defendant interfered with the exercise of her right to participate in a Title VII charge of discrimination arising from her "decision making leave" in April 2019.

Under the ADEA, in Count II, the Plaintiff alleges age discrimination (based on her age of 56) by the Defendant when it: (1) terminated her employment, (2) failed to promote her, (3) provided unequal terms and conditions of her employment, and (4) retaliated against her.

Under the FMLA, in Count III, the Plaintiff alleges that the Defendant (1) terminated her employment and refused to reinstate her, (2) interfered with, restrained, and/or denied the exercise of her by refusing her request for protected leave and refusing to reinstate her, (3) failed to tell the Plaintiff the decision on her requested leave, (4) knew or should have known that silence regarding the Plaintiff's requested leave on or about September 16, 2019, amounts to deception by concealment, and (5) interfered with her right to take leave by failing or refusing to advise her that her requested leave was denied and that she would be terminated. In Count IV, the Plaintiff alleges that the Defendant (1) retaliated against her by terminating her, (2) interfered with the exercise of her right to unpaid leave pursuant to an approved intermittent leave schedule by terminating Plaintiff's employment, ordering her not to take leave, or discouraging her from taking leave, and (3) interfered with the exercise of her right to unpaid leave by failing to provide her with a written notice detailing the specific expectations and obligations of her during approved leave and explaining any consequences of a failure to meet these obligations.

## SUMMARY JUDGMENT STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant may discharge this burden by "either: (1) showing that there is an absence of evidence supporting an essential element of the non-moving party's claim; or

(2) presenting affirmative evidence that negates an essential element of the non-moving party's claim." *Hummel v. St. Joseph Cnty. Bd. of Comm'rs*, 817 F.3d 1010, 1016 (7th Cir. 2016) (citation omitted). In response, the non-movant "must make a sufficient showing on every element of [her] case on which [she] bears the burden of proof; if [she] fails to do so, there is no issue for trial." *Yeatts v. Zimmer Biomet Holdings, Inc.*, 940 F.3d 354, 358 (7th Cir. 2019) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). In ruling on a motion for summary judgment, a court must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Id.* (citation omitted). A court's role "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994) (citations omitted).

## MATERIAL FACTS[1]

### A.    The Plaintiff's Employment with the Defendant

The Plaintiff, who identifies her race and color as Black, began her career with the Defendant as a Telephone Operator in 2005. Pl. Ex. 1, ¶¶ 17, 21, ECF No. 46-1; Def. Ex. B, 23–

---

[1] In its reply, the Defendant argues that its version of the facts should be deemed admitted because the Plaintiff failed to comply with Northern District of Indiana Local Rule 56-1. Def. Reply 2, ECF No. 47. "When a responding party's statement fails to dispute the facts set forth in the moving party's statement in the manner dictated by the [local] rule, those facts are deemed admitted for purposes of the motion." *Curtis v. Costco Wholesale Corp*., 807 F.3d 215, 218 (7th Cir. 2015) (citation omitted); *see* Fed. R. Civ. P. 56(c)(1) (requiring parties to properly support their assertion of a genuine dispute). Here, Local Rule 56-1 requires the moving party to file a Statement of Material Facts with each fact numbered, a short statement, and a citation to the supporting evidence. N.D. Ind. L.R. 56-1(a)(3). Local Rule 56-1 requires the nonmoving party to then file a Response Statement of Material Facts with a verbatim restatement of the moving party's Statement of Material Facts, a corresponding numbered response that identifies each disputed fact along with supporting evidence, and Additional Material Facts with any undisputed facts that includes citations to supporting evidence. N.D. Ind. L.R. 56-1(b)(2). The Defendant properly filed its Statement of Material Facts. *See* ECF No. 42. However, the Plaintiff did not file a Response Statement of Material Facts. Instead, in her brief, the Plaintiff included the section "Statement of Genuine Issues of Material Fact," Pl. Br. 2–3, ECF No. 46, which is deficient because it largely argues the merits of her

24, ECF No. 42-2; Def. Ex. A ¶ 8, ECF No. 42-1. The Plaintiff held other positions with the

Defendant during her employment, including Central Scheduler, Quality Assurance Coordinator,

Epic EMR System Trainer, and Patient Access Specialist. Def. Ex. B, 23–31; Def. Ex. A, ¶ 8. On

July 14, 2014, she was promoted to the position of the Regional Scheduling Manager in the

Central Scheduling Department—the last position she held with the Defendant. Def. Ex. A, ¶ 8;

Def. Ex. B, 30–31; Def. Ex. C, ECF No. 42-3. The Plaintiff states that she was the only Black

manager in her department. Pl. Ex. 1, ¶¶ 17, 21.

**B.     The Plaintiff's Employment Performance and Working with Management,
         Leadership, and Communication in 2014 and 2015**

In her employment with the Defendant, the Plaintiff generally received very good overall

reviews from all her supervisors and continued to advance her career. *See generally* Def. Ex. B,

81–89; Def. Exs. E–I, Q, V, ECF Nos. 42-5–42-9, 42-16–42-17, 42-22. Specifically, in each

designated year, the Plaintiff received the following overall performance review score: (1) 3.34

out of 4.00 (2011), Def. Ex. E at 7; (2) 3.67 out of 4.00 (2012), Def. Ex. F at 8; (3) 3.25 out of

4.00 (2013), Def. Ex. H at 10; (4) 4.00 out of 4.00 (2014), Def. Ex. I at 9; (5) 2.4 out of 3.0

(2015), Def. Ex. P at 2; (6) 2.7 out of 3.0 (2017), Def. Ex. Q at 2; and (7) 2.3 out of 3.0 (2018),

Def. Ex. V at 2. On the 4.00 scale, a score of 3.50 to 4.00 is outstanding, 2.50 to 3.49 is

commendable, 2.00 to 2.49 is meets expectations, and 0.00 to 1.99 is unsatisfactory. *See, e.g.*,

Def. Ex. E. On the 3.0 scale, 3.0 is exceptional, 2.0 is fully satisfactory, and 1.0 is needs

improvement. *See, e.g.*, Def. Ex. V.

---

claim, fails to identify which specific facts she disputes, and does not properly cite the record when
claiming undisputed facts or when claiming that there is a dispute. *See* N.D. Ind. L.R. 56-1(b)(2). Given
the Plaintiff's failure to properly dispute the facts identified in the Defendant's Statement of Material
Facts under Local Rule 56-1, the Court accepts those facts as admitted. *See Curtis*, 807 F.3d at 218.

However, in September 2014, the Plaintiff complained to the Defendant's human resources department (HR) about Katherine Horn's (the Plaintiff's supervisor from 2014 to 2019) management style, such as that Horn banned showing favoritism to employees and allowing the Plaintiff's subordinates to bring her food. Def. Ex. B, 115–16; Def. Ex. M, Ex. 29, ECF No. 42-13. In response, HR told the Plaintiff that, in the future, she should follow the chain of command and address these kinds of issues with Horn first. Def. Ex. B, 116–19. Also, in the Plaintiff's 2015 Performance Appraisal by Horn, Horn noted in the section "Opportunities for Improvement": "[The Plaintiff] . . . needs to know her audience during meetings and respond appropriately. This will allow the employee or manager she is meeting with to get her undivided attentions." Def. Ex. P.

**C.      The Plaintiff's "Chain of Command" Complaint**

In 2016 or 2017,[2] the Plaintiff complained to Deborah White, who was Horn's direct manager, that Kristi Gentille,[3] a supervisor within the Plaintiff's department who reported to the Plaintiff, was not properly following the chain of command because she was not reporting to the Plaintiff and instead was going directly to Horn. Pl. Ex. 1, ¶¶ 12–14; Def. Ex. B, 124, 140–42. In her complaint, the Plaintiff also included her concern that Horn was undercutting her oversight and management of financial counselors by isolating the Plaintiff from these duties. Pl. Ex. 1, ¶¶ 12, 13. When making the complaint to White, the Plaintiff did not talk about race discrimination.

---

[2] In her deposition, the Plaintiff designated this meeting as taking place about one year after she began her management position (which would have been in 2016) but also said it took place in 2017 or 2018. Def. Ex. B, 142. In her affidavit, the Plaintiff states this complaint to White took place in 2017. Pl. Ex. 1, ¶¶ 13, 14. The Defendant uses 2016 in its Statement of Material Facts. ECF No. 42 at 10.

[3] The record contains various spellings for this person's name, including "Chrissi Gentile" or "Krissi Gentile" (by the Plaintiff), "Kristi Gentille" (by the Defendant), and "Krissi Gentile" (in the Plaintiff's deposition).

Def. Ex. B, 174.[4] In response to the complaint, White met with the Plaintiff and Horn, and she instructed Horn that Gentille should be reporting directly to the Plaintiff, not to Horn. *Id.* 141, 173. After the meeting with White, the Plaintiff experienced problems with Horn and the relationship "just turned ugly," meaning "relations" between the two "just went downhill." *Id.* 173. The Plaintiff did not believe that these problems with Horn were due to racial animus but instead believed the problems were due to the Plaintiff reporting Horn to White (for the chain of command issue). *Id.* 127, 173–74.[5]

## D.   Gentille's Comments

Gentille was hired in early 2015 and was subsequently promoted to a supervisory position in the Plaintiff's department, reporting to the Plaintiff until Gentille transferred to another department in February 2019. Def. Ex. B, 38–42, 124, 136–37; Def. Ex. A, ¶¶ 12, 28. The Plaintiff testified that "not long after [Gentille] started working with . . . our group," Gentille commented that "she was raised KKK," "her grandmother raised her," and "the first time she saw a Black person it was a Black girl at a post office . . . and the grandmother told her that was

---

[4] In her affidavit offered in support of summary judgment, the Plaintiff asserts that she reported to White that Horn "was promoting a white racist, Chrissi Gentile," Pl. Ex. 1, ¶ 16, and she "complained about disparate treatment," *id.* at ¶ 21. To the extent that the Plaintiff uses these affidavit statements to support her claim that Horn retaliated against her based on race or for a claim of disparate treatment based on race, this is contrary to her deposition testimony, and the Plaintiff offers no explanation for the conflict. Therefore, the Court disregards these statements in the affidavit. *See James v. Hale*, 959 F.3d 307, 316 (7th Cir. 2020) ("[T]he sham-affidavit rule prohibits a party from submitting an affidavit that contradicts the party's prior deposition or other sworn testimony."). Moreover, these statements in the affidavit are conclusory and, thus, insufficient to survive summary judgment. *See King v. Ford Motor Co.*, 872 F.3d 833, 840 (7th Cir. 2017).

[5] The Plaintiff also states in her affidavit that she "was the only black manager" and Horn's treatment after the 2017 meeting "was retaliatory, based on [her] report of the Horn-Gentile situation." Pl. Ex. 1, ¶ 17. To the extent that the Plaintiff uses these affidavit statements to support the inference that Horn retaliated against the Plaintiff based on race (for the Plaintiff's complaint to White), this contradicts the statement she made in her deposition. Because the Plaintiff has offered no explanation for this conflict, the Court disregards paragraph 17 of her affidavit. *See James*, 959 F.3d at 316. Moreover, the statements in the affidavit are conclusory and, thus, insufficient to survive summary judgment. *See King*, 872 F.3d at 840.

monkeys." Def. Ex. B, 153. In her affidavit, the Plaintiff added that Gentille commented that "her initials under her maiden name" were KKK. Pl. Ex. 1, ¶ 7. The Plaintiff also added that Gentille related the "KKK" and "monkey" comments "at least two (2) or three (3) times a month, probably more than 50 times total." *Id*. ¶ 8. As Gentille's supervisor, the Plaintiff responded, "That's your past. Do you have to keep saying this?" Def. Ex. B, 157. The Plaintiff also said, "What's the importance of this story?" *Id*. 158. The Plaintiff testified that she "really wanted to understand [Gentille] on a personal level." *Id*. The Plaintiff did not report to Horn that Gentille's comments violated the [Defendant's] EEO policy." *Id*. 156. She also did not escalate the issue with HR or anyone else. *Id*. The Plaintiff testified that Gentille did not say she was making the "KKK" and "monkey" comments because she was against Black people. *Id*. 159. However, the Plaintiff said that she was concerned that Gentille harbored racial animus toward Black people. *Id*. The Plaintiff clarified in her affidavit that based on the "KKK" and "monkey" comments she "viewed . . . Gentile as a racist." Pl. Ex. 1, ¶ 9. However, the Plaintiff also testified that she did not discipline Gentille for the comments "because there was nothing egregious." Def. Ex. B, 159.

### E.   The Plaintiff's Performance and Working with Management, Leadership, and Communication beginning in 2017

In the 2017 Performance Appraisal, Horn noted that the Plaintiff needs to use "[c]lear and concise communication for [the] expected result." Def. Ex. Q at 6. Horn also noted that the Plaintiff needs to look at issues "from a global perspective prior to submitting recommendations" and "accept constructive ideas as efficiency in work flow verses criticism of her work." *Id*. Horn commented that the Plaintiff's average score was 1.5 out of 3.0 for "communication." *Id*. at 3. Horn commented that in her experience the Plaintiff "often has great ideas and wants to contribute, but her initial response is argumentative. [She] expect[s] [the Plaintiff] to work on this in the future and seek help through [the Defendant's] education department if needed." *Id*.

7

As a result of these concerns, in April 2017, the Defendant's Human Resources team conducted focus group surveys, and the results reflected staff complaints regarding leadership in the Plaintiff's department. Def. Ex. A, ¶ 17. Kellee Link, the Defendant's human resources manager, determined that the department was struggling to be managed as a cohesive team by the Plaintiff, Horn, and Gentille. *Id.* ¶¶ 3, 17. As a result, Link conducted an investigation by interviewing the Plaintiff, Horn, and Gentille. *Id.* ¶ 18. During her interview, the Plaintiff complained about Horn's management style. *Id.* However, the Plaintiff did not complain to Link that she believed that the management team was struggling due to race-based discrimination or that she was being harassed by anyone due to her race. *Id.* On November 17, 2017, Link emailed the team her findings and recommendations. *Id.* ¶ 20; Def. Ex. R at 2, ECF No. 42-18. She found that the management team was struggling with clear communication, trust, and respect. Def. Ex. A, ¶ 19; Def. Ex. R at 2. Based on these issues, Link scheduled management employee assistance program (EAP) sessions for the team. Def. Ex. B, 68–70; Def. Ex. A, ¶¶ 20–21; Def. Ex. R at 2.

The Plaintiff, Horn, and Gentille attended approximately three management EAP sessions together with Julie Kissee, the Defendant's leadership development coach and EAP manager, for the purpose of resolving the issues that were affecting their ability to jointly manage the department. Def. Ex. A, ¶ 21; Def. Ex. S at 2, ECF No. 42-19; Def. Ex. B, 236–37. During the sessions, the Plaintiff brought up concerns with Horn's management style and the concern that Gentille was not adhering to the proper chain of command. Def. Ex. B, 236–37.

On March 12, 2018, Kissee provided written feedback to Link about the EAP management sessions. Def. Ex. S at 2; Def. Ex. A, ¶ 22. Kissee found that Gentille and the Plaintiff were able to resolve their issues during the sessions but that the Plaintiff and Horn were unable to resolve their issues. Def. Ex. S at 2; Def. Ex. A, ¶ 22. Kissee's "professional opinion

[was] that . . . [Horn's] attempts at any professional communication will not be successful due to [the Plaintiff's] inability to trust and respect [Horn's] role as director." Def. Ex. S at 2; Def. Ex. A, ¶ 23. The Plaintiff believed Kissee's opinion was "biased" against her and that Kissee was "targeting" her, but the Plaintiff was "unsure" what the root of the bias was. Def. Ex. B, 241.

On April 3, 2018, Horn and Link met with the Plaintiff to discuss performance issues and to develop an action plan to improve her performance. Def. Ex. A, ¶ 24. They discussed (1) the Plaintiff's passive aggressive communication style and gave examples regarding the same; (2) treating Gentille with respect and scheduling one-on-one meetings to build the relationship and ensure that there was open communication and everyone was heard; (3) the appropriate chain of command and proper place and time for certain communication; (4) having appropriate non-verbal communication; (5) being open to receiving feedback; and (6) not making inappropriate comments. Def. Ex. U, ECF No. 41-21; Def. Ex. B, 244–58; Def. Ex. A, ¶ 24. Horn asked the Plaintiff to be aware of her non-verbal communication—slamming doors, rolling her eyes, raising her voice, taking on a demeaning tone, and making dismissive noises—and addressing things by talking it through; and Horn told the Plaintiff that she would be expected to communicate professionally moving forward. Def. Ex. U; Def. Ex. B, 244–58; Def. Ex. A, ¶ 24.

In the 2018 Performance Appraisal, Horn noted that the Plaintiff "[r]ecently during an implementation . . . was not clear on her role for the Woodland Cancer Center and stated such on a conference call in front of her team." Def. Ex. V at 4. Horn also noted that "[d]uring the same teleconference [the Plaintiff] was not supportive of her Director by asking [] out of scope questions about closing the West Annex due to weather related issue." *Id*. Horn explained that "[t]hese are some of the examples which [the Plaintiff] did not exhibit cooperation and team work with her Director or her subordinates." *Id*. Horn additionally commented that "[the

Plaintiff] continues to struggle with communication both verbal and non-verbal." *Id*. at 6. She issued the Plaintiff a score of 0.0 out of 3.0 for "Communication and Interpersonal Skills." *Id*. at 3.

On August 29, 2018, Horn and Link met with the Plaintiff to coach her about engaging in professional communication. Def. Ex. X, ECF No. 42-24. They asked the Plaintiff to be aware of her verbal and non-verbal response when she is frustrated, citing a specific incident during the end of an interview that the Plaintiff had attended for a prospective employment candidate. *Id*. The Plaintiff's verbal and non-verbal communication showed that she was frustrated, as she folded her arms and used a tone indicating frustration. *Id*. Horn and Link acknowledged that there will be times when leaders may be frustrated, but management is expected to remain professional. *Id*.

On October 31, 2018, the Plaintiff met with Karen Smithers, the Defendant's administrative director of human resources, and Annette Kopp, the Defendant's systems director. Def. Ex. B, 222–23; Def. Ex. Y, ¶ 4, ECF No. 42-25; Def. Ex. DD, ¶ 3, ECF No. 42-30. During this meeting, the Plaintiff complained about the structure and chain of command of the Central Scheduling Department, her workload, her belief that she was being micromanaged by Horn, and the poor working relationship she had with Horn and Gentille. Def. Ex. B, 322–25; Def. Ex. Y, ¶ 5; Exhibit DD, ¶ 3.

The Plaintiff also complained that she was being discriminated against based on her race. Def. Ex. B, 222–23; Def. Ex. Y, ¶ 5; Def. Ex. DD, ¶ 3. Kopp and Smithers asked the Plaintiff to provide specific examples of why she felt she was being discriminated against. Def. Ex. B, 322–25; Def. Ex. Y, ¶ 5; Def. Ex. DD, ¶ 3. The Plaintiff agreed to provide specific examples or situations that she claimed were discriminatory, Def. Ex. Y, ¶¶ 5–6; Def. Ex. DD, ¶ 3; however,

10

there is no evidence that she ever did. The Plaintiff testified that this was the only meeting where she "expressed race discrimination." Def. Ex. B, 222.[6] By race discrimination, the Plaintiff clarified that she meant the way that Horn was "favoring" Gentille over her. *Id*. 323.

In January 2019, Link and her staff conducted interviews with all employees who worked in the Central Scheduling Department. Def. Ex. A, ¶ 25. The Plaintiff's behavior and performance came up in the interviews. *Id.* Several staff members gave examples of unfavorable experiences working with the Plaintiff, such as the Plaintiff not treating everyone in the same manner, having issues with confidentiality, picking on certain people, talking about others behind their backs, using a negative tone when staff ask questions, not answering questions, not supporting employees, getting frustrated easily, speaking unprofessionally, disclosing another employees FMLA leave, showing favoritism, speaking unprofessionally, and gossiping about staff members. *Id*. ¶ 26.

### E.    Decision Making Leave

On April 2, 2019, Link, Kopp, and Horn met with the Plaintiff, and they placed her on decision making leave in an attempt to address her poor performance issues, including the poor reviews from staff and poor communication with her peers in management. Def. Ex. CC, ECF No. 42-29; Def. Ex. A, ¶ 29; Def. Ex. DD, ¶¶ 5–6; Def. Ex. B, 315–18, 322–25.[7] Decision making leave is a tool that the Defendant's human resources department uses for employees who

---

[6] The Plaintiff appears to offer a contrary statement in her affidavit by labelling Gentille a "racist" for the purpose of attempting to support the inference that the Plaintiff reported racial discrimination prior to the October 31, 2018 meeting. Pl. Ex. 1, ¶¶ 10, 11, 16. Because the Plaintiff offers no factual basis for this contrary statement, the Court disregards the label in the affidavit insofar as it is used to show the Plaintiff reported racial discrimination. *See James*, 959 F.3d at 316. Moreover, the label in the affidavit is conclusory and, thus, insufficient to survive summary judgment. *See King*, 872 F.3d at 840.

[7] The Plaintiff testified that she felt that the character traits that Kopp and Horn described were the product of racial discrimination. Def. Ex. B, 339–41. Specifically, the Plaintiff believed that, by speaking about her tone of voice and her rolling her eyes, Horn and Kopp were trying to portray the Plaintiff as an "angry Black woman." *Id*. 340.

engage in problematic and unacceptable behavior, conduct, and/or communication. Def. Ex. A, ¶ 29. It is used by the Defendant as a last chance agreement, such that if an employee does not meet the expectations outlined in the decision making leave, the employee may be discharged. Def. Ex. A, ¶ 29.

When Link, Kopp, and Horn met with the Plaintiff, they provided her with performance and communication expectations. Def. Ex. CC; Def. Ex. A, ¶ 30; Def. Ex. DD, ¶ 6. They also advised the Plaintiff that she was required to make a final decision to solve the immediate performance and communication problems or to look for other employment. Def. Ex. CC; Def. Ex. A, ¶ 31; Def. Ex. DD, ¶ 6. They asked the Plaintiff to report back to work and meet with Horn or Kopp on April 4, 2019, with a final decision. Def. Ex. CC; Def. Ex. A, ¶ 31; Def. Ex. DD, ¶ 6. On April 4, 2019, the Plaintiff informed Horn and Kopp that she did not want to end her employment, and she agreed to maintain fully acceptable behavior and performance. Def. Ex. CC; Def. Ex. DD, ¶ 7. Additionally, the Plaintiff testified that Horn, Link, and Kopp never made race-based comments to her. Def. Ex. B, 376–78.

## F.    FMLA Leave

From April 4, 2019, to May 31, 2019, the Plaintiff took intermittent FMLA leave for herself, and from April 24, 2019, to September 17, 2019, the Plaintiff took intermittent FMLA leave to care for her daughter. Def. Ex. B, 330–37, 351–52. Sedgwick was a company used by the Defendant to administer FMLA leave. *Id*. 331–33. The Plaintiff and her doctor filled out appropriate paperwork to request FMLA leave through Sedgwick. *Id*. Sedgwick approved the Plaintiff for intermittent FMLA leave. *Id*. 330–37, 351–52. Also, the Defendant accommodated all time off that the Plaintiff requested. *Id*. 348.

**G.        Performance Issues During the Plaintiff's FMLA Leave**

On May 1, 2019, Kopp and Horn met with the Plaintiff to discuss a complaint about

long wait times that patients were experiencing in the Plaintiff's department and, among other

things, general concerns with how the Plaintiff was running her department. Def. Ex. DD, ¶ 8. At

one point, Horn left the meeting, and Kopp asked the Plaintiff whether she believed she could

work with Horn going forward. *Id*. The Plaintiff's response was that she could work with Horn if

Horn stopped micromanaging her. *Id*.

On August 22, 2019, Link met with the Plaintiff to inform her of the results from a July

2019 poll of Central Scheduling staff (from the Plaintiff's department) that HR conducted. Def.

Ex. A, ¶ 32. The poll included the following topics on whether (1) their department was working

better, (2) staff was treated in a manner consistent with the Defendant's values, (3) employees

were held to the same performance expectations, (4) there was confidentiality in the department,

(5) staff felt that they received sufficient training in their respective roles, (6) they believed their

department manager and/or supervisor was supportive, (7) their department management

portrayed the Defendant's values, (8) management had inappropriate conversations with staff,

and (9) what changes employees would like to see. *Id*. The survey results indicated that the

Plaintiff's department continued to struggle under her management in these key areas. *Id*.

**H.        Termination of the Plaintiff's Employment**

On September 18, 2019, Kopp and Link met with Plaintiff and informed her that the

Defendant was discharging her. Def. Ex. B, 373–75; Def. Ex. FF, ECF No. 42-32; Def. Ex. A,

¶ 34; Def. Ex. DD, ¶ 10. The Defendant's decision to discharge the Plaintiff was based on the

2017 focus group surveys which led to the EAP sessions; the additional focus group and follow

up employee engagement surveys; counseling sessions that management and human resources

13

conducted with the Plaintiff; and the conclusion by Link, Kopp, Smithers, and Horn that the Plaintiff was unable to change behavior, conduct, and communication issues, resulting in her inability to effectively manage her team and work with the management team effectively. Def. Ex. A, ¶ 33; Def. Ex. DD, ¶ 9; Def. Ex. Y, ¶ 7.

## ANALYSIS

The Defendant moves for summary judgment on each of the Plaintiff's claims. The Court first addresses the Title VII race discrimination and retaliation claims and then addresses the FMLA retaliation claim before turning to the remaining claims, which the Plaintiff has abandoned.

### A.   Title VII

*1.   Discrimination*

Under Title VII, it is "unlawful . . . for an employer . . . to discriminate against any individual with respect to . . . compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). In assessing the Plaintiff's Title VII discrimination claim based on race, the Court considers whether the evidence as a whole "would permit a reasonable factfinder to conclude that the plaintiff's race . . . caused the [plaintiff's] discharge or other adverse employment action." *Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 499 (7th Cir. 2017) (quoting *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)).[8] In this case, although

---

[8] The Defendant argues for summary judgment under both the standard outlined in *Ortiz*, as well as the standard outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The Plaintiff, however, presents her argument solely in terms of the *Ortiz* framework. The Court therefore employs that construct to address the Defendant's motion. *See Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 957–58 (7th Cir. 2021) ("[A] plaintiff need not use the *McDonell Douglas* framework after *Ortiz*. At summary judgment, '[w]hat matters is whether [a plaintiff] presented enough evidence to allow the jury to find in [her] favor.'" (quoting *Vega v. Chi. Park Dist.*, 954 F.3d 996, 1004 (7th Cir. 2020))).

the Plaintiff shows an adverse employment action, she has failed to offer evidence to create a genuine dispute of material fact that it was taken because of her race.[9]

Beginning with the adverse employment action element, the Plaintiff must show "a materially adverse change in the terms and conditions of employment [that is] more disruptive than a mere inconvenience or an alteration of job responsibilities." *Alamo v. Bliss*, 864 F.3d 541, 552 (7th Cir. 2017) (quoting *Stockett v. Muncie Ind. Transit Sys.*, 221 F.3d 997, 1001 (7th Cir. 2000)). That might include a negative impact on the Plaintiff's wealth and career prospects or other "changes to work conditions that include humiliating, degrading, unsafe, unhealthy, or otherwise significant negative alteration in the workplace." *Madlock v. WEC Energy Grp., Inc.*, 885 F.3d 465, 470 (7th Cir. 2018) (quoting *Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016)); *see Terry v. Gary Cmty. Sch. Corp.*, 910 F.3d 1000, 1005 (7th Cir. 2018). Here, the Plaintiff identifies her termination and appears to also identify the fall in her performance review score— going from 2.7 in 2017 to 2.3 in 2018—as adverse employment actions.

Changes that amount to an adverse employment action need to involve a degree of objective hardship, and the Plaintiff's subjective unhappiness will not suffice. *See Madlock*, 885 F.3d at 471; *see also Lewis v. Wilkie*, 909 F.3d 858, 870–71 (7th Cir. 2018) ("[N]ot everything that makes an employee unhappy is an actionable adverse action." (quoting *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996))). Without question, the Plaintiff's termination meets this objective standard. *O'Neal v. City of Chicago*, 392 F.3d 909, 911 (7th Cir. 2004) (identifying an employee's "termination" as an adverse employment action). However, the 0.4 drop in her performance score—even if she found it unwarranted—does not. *See Abrego v. Wilkie*, 907 F.3d

---

[9] Although the Plaintiff's response brief could be read as abandoning her race discrimination claim (it focuses on the Title VII and FMLA retaliation claims), Pl. Resp. 3–7, ECF No. 46, the Court nevertheless addresses the discrimination claim on the merits.

1004, 1012 n.2 (7th Cir. 2018) ("[N]egative evaluations and letters of inquiry are not adverse

employment actions." (quoting *Lucas v. Chi. Transit Auth.*, 367 F.3d 714, 731 (7th Cir. 2004)).

Thus, based on the arguments and evidence the Plaintiff presented, she has only identified her

termination as an adverse employment action that would form the basis of her race

discrimination claim.

   Nevertheless, the Plaintiff fails to present evidence indicating that the Plaintiff's

termination was because of her race. In support of her claim, it appears that the Plaintiff

identifies some comments made by Gentille, a supervisor who worked under the Plaintiff.

Gentille commented that she was "raised KKK," her initials under her maiden name were KKK,

and her grandmother said Black people are monkeys. Even if Gentille's comments were overt

expressions of animosity toward Black people, "bigotry, per se, is not actionable. It is actionable

only if it results in injury to a plaintiff; there must be a real link between the bigotry and an

adverse employment action." *Gorence v. Eagle Food Ctrs., Inc.*, 242 F.3d 759, 762 (7th Cir.

2001). Here, Gentille was a subordinate of the Plaintiff's, and then Gentille transferred to another

department in February 2019—seven months before the Defendant's termination of the Plaintiff.

Also, the record does not contain any evidence showing that Gentille ever played a decision

making role in terminating the Plaintiff. Furthermore, the Plaintiff testified that those in decision

making roles, such as Horn, Kopp, and Link, never made race-based comments to her.

Consequently, no reasonable jury could find a link between Gentille's "KKK" and "monkey"

comments and the Defendant's termination of the Plaintiff.

   It seems the only evidence in the record showing a causal connection is the fact that the

Plaintiff was the sole Black manager in her department. That fact alone will not avoid summary

judgment. *See Loving v. Lew*, 512 F. App'x 616, 619 (7th Cir. 2013) ("[T]o survive summary

judgment a plaintiff must produce evidence that the conduct was at least motivated by race . . . . [T]he fact that [the plaintiff] was the only black employee in her group is insufficient to support that inference." (cleaned up)). Rather, the evidence as a whole points to the Plaintiff's performance and communication issues as the reason—whether justified or not—for the ultimate decision to terminate the Plaintiff. Simply put, "[a]ll of the criticisms used non-racial language, and nothing else about their context suggests that they were racially motivated." *Brown*, 700 F.3d at 1106; *see Hanners v. Trent*, 674 F.3d 683, 694 (7th Cir. 2012) (finding that the plaintiff's "subjective beliefs" about the implications of the defendant's statements were insufficient to create a genuine issue of material fact). Accordingly, a reasonable jury could not conclude that the Defendant's action was taken because of the Plaintiff's race.

Thus, the Plaintiff has failed to raise a genuine dispute of fact that race discrimination is linked to an adverse employment action by the Defendant. Since the Plaintiff presents no other arguments or evidence to support her race discrimination claim, the Court grants summary judgment in favor of the Defendant on the Plaintiff's race discrimination claim (Count I). Because the Plaintiff's race discrimination claim fails on the merits, the Court does not address the Defendant's arguments on the scope of the EEOC charge and the statute of limitations.

2.      *Retaliation*

Under Title VII, an employer is prohibited "from retaliating against an employee for opposing or participating in an investigation of an unlawful employment practice." *Lewis*, 909 F.3d at 866 (citing 42 U.S.C. § 2000e-3(a); *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016)). To survive summary judgment on this claim, the Plaintiff must offer evidence (1) that she engaged in a statutorily protected activity, (2) that she suffered a materially adverse action taken by the employer, and (3) of a causal connection between the two. *Id.* (citing

*Lord*, 839 F.3d at 563). The Court will then "evaluate the evidence as a whole to determine if it 'would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Id.* at 867 (quoting *Ortiz*, 834 F.3d at 764–65).

For the first time in her summary judgment brief, the Plaintiff argues that the Defendant retaliated against her for a complaint to White, Horn's supervisor (Horn was the Plaintiff's supervisor).[10] In reply, the Defendant argues that it is entitled to summary judgment because the Plaintiff's complaint to White was not a statutorily protected activity. The Court agrees with the Defendant and concludes that summary judgment is appropriate on the Plaintiff's Title VII retaliation claim.

To be considered a statutorily protected activity under Title VII, a plaintiff must complain that "discrimination occurred because of sex, race, national origin, or some other protected class." *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 718 (7th Cir. 2018) (quoting *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006)). It is not enough to simply complain "about some situation at work, no matter how valid the complaint might be." *Id.* (quoting *Cole v. Bd. of Trs. of N. Ill. Univ.*, 838 F.3d 888, 901 (7th Cir. 2016)). Rather, "[a] complaint of discrimination is a protected activity under Title VII only if the discrimination is based on a protected characteristic like race." *Miller v. Chi. Transit Auth.*, 20 F.4th 1148, 1155 (7th Cir.

---

[10] To the extent the Plaintiff previously alleged that, under Title VII, she was retaliated against for the Defendant's failure to promote her, for unequal terms and conditions of employment, for opposing discriminatory practices in the workplace, and for filing a Title VII claim with the EEOC for race-based discrimination on April 12, 2019, she has abandoned those bases for her claim since she did not discuss them in her summary judgment response brief. *See Palmer v. Marion County*, 327 F.3d 588, 597 (7th Cir. 2003) (concluding that a claim was abandoned when a party failed to defend it "in his district court brief in opposition to summary judgment").

2021); *see also McHale v. McDonough*, 41 F.4th 866, 871 (7th Cir. 2022) ("The charge—whether formal or informal—must be about the discrimination.").

Here, the Plaintiff does not point to facts or details showing that the Plaintiff's complaint involved racial discrimination. The only part of the record the Plaintiff points to is her affidavit where the Plaintiff states she, Horn, and White "met to discuss the department structure, specifically the fact that Krissi Gentile [the Plaintiff's subordinate] and Katherine Horn were isolating [the Plaintiff] from oversight and management of financial counselors," she reported that "Horn was undercutting [her] supervisory authority by promoting a white racist, Chrissi Gentile, to assume [her] job responsibilities," and at the conclusion of the meeting "White reinstated the proper chain of command." However, the Plaintiff's affidavit cannot be used to contradict her prior testimony that she did not believe that the problems with Horn were due to racial animus. *James*, 959 F.3d at 316. Therefore, the complaint to White only raised an issue about Horn's isolation of the Plaintiff, including an issue with the proper chain of command, which is not a type of complaint protected under Title VII. *See Skiba*, 884 F.3d at 718. Thus, the Plaintiff's complaint to White cannot serve as a basis for her retaliation claim.

In response, the Plaintiff argues that her activity was protected by Title VII, but she provides no caselaw for that assertion. She generally relies on *Miller* and *McHale*, but those cases do not help her argument. In *Miller*, the plaintiff complained that "he felt he was being 'targeted' and treated unfairly" but he did "not mention a reason for this treatment and certainly did not attribute it to race." 20 F.4th at 1155 (concluding the plaintiff's retaliation claim under Title VII failed because he did not show he had engaged in statutorily protected activity). Like the *Miller* plaintiff, here, the Plaintiff did not attribute her complaint about Horn to race. *See id*. Similarly, in *McHale*, the plaintiff filed a union grievance and EEOC complaint, but she did not

show that "those complaints implicated her alleged protected class . . . ." 41 F.4th at 872
(concluding the plaintiff's retaliation claim failed to show she had engaged in statutorily
protected activity). Again, so, too, here.

Accordingly, the Plaintiff's retaliation claim fails on the first element. Since the Plaintiff
has not shown that she engaged in a statutorily protected activity, the Court need not address the
Defendant's arguments about causation or the Plaintiff's arguments about pretext. The Defendant
is entitled to summary judgment on the Plaintiff's claim for retaliation under Title VII (Counts I
and IV) of the Plaintiff's Amended Complaint.

**B.      FMLA Retaliation**

The FMLA makes it illegal for an employer to retaliate against an employee for taking
FMLA leave. *See Freelain v. Village of Oak Park*, 888 F.3d 895, 900 (7th Cir. 2018) (citing 29
U.S.C. § 2615). To prove a retaliation claim, a plaintiff must establish that (1) she engaged in a
statutorily protected activity, (2) the employer took an adverse action against her, and (3) there is
a causal connection between the two. *Id.* at 901 (citing *Pagel v. TIN, Inc.*, 695 F.3d 622, 631 (7th
Cir. 2012)). A retaliation claim "requires proof of discriminatory or retaliatory intent." *Goelzer v.
Sheboygan County*, 604 F.3d 987, 995 (7th Cir. 2010) (quoting *Kauffman v. Fed. Express Corp.*,
426 F.3d 880, 884 (7th Cir. 2005)). "To succeed on a retaliation claim, the plaintiff does not need
to prove that 'retaliation was the *only* reason for [the adverse action]; she may establish an
FMLA retaliation claim by 'showing that the protected conduct was a substantial or motivating
factor in the employer's decision.'" *Id.* at 995 (quoting *Lewis v. Sch. Dist. #70*, 523 F.3d 730,
741–42 (7th Cir. 2008)).

First, the Plaintiff appears to argue that a reasonable jury could conclude that the timing
of the Defendant's actions shows an intent to retaliate against her by terminating her employment

for using FMLA leave. However, "suspicious timing alone rarely is sufficient to create a triable issue, and on a motion for summary judgment, mere temporal proximity is not enough to establish a genuine issue of material fact." *Riley v. City of Kokomo*, 909 F.3d 182, 188 (7th Cir. 2018) (cleaned up). Also, evidence showing that an employer "proceed[ed] along lines [for an employment action] previously contemplated . . . is no evidence whatever of causality." *Cichon v. Exelon Generation Co*., 401 F.3d 803, 811 (7th Cir. 2005) (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001)). Here, although the Plaintiff points to the fact that she took FMLA leave twice in the time between the April 2019 decision-making leave and her termination, it is undisputed that the Defendant contemplated her termination before her FMLA leave due to poor performance based on leadership and communication issues. Thus, the Plaintiff's use of "suspicious timing" evidence does not constitute evidence of causality. *See Cichon*, 401 F.3d at 811.

"[A] plaintiff must ordinarily present other evidence that the employer's explanation . . . was pretext for retaliation." *Riley*, 909 F.3d at 188–89. In assessing pretext, a court does "not evaluate whether the stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered to explain" the adverse action. *Harden v. Marion Cnty. Sheriff's Dep't*, 799 F.3d 857, 864 (7th Cir. 2015) (cleaned up); *see also Castetter v. Dolgencorp, LLC*, 953 F.3d 994, 997 (7th Cir. 2020) ("The only concern in reviewing an employer's reasons for termination is the honesty of the employer's beliefs." (citation omitted)). "A pretextual decision, then, involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is [a] lie, specifically a phony reason for some action." *Harden*, 799 F.3d at 864 (cleaned up).

Here, the Plaintiff notes that the Defendant based its termination decision on two-year old peer reviews instead of her compliance with the goals of the April 2019 one-day, decision-making leave, including improvement in her communication. From these facts, the Plaintiff appears to reason that a reasonable jury could conclude that the Defendant terminated the Plaintiff in retaliation for using her FMLA leave. This assertion is not supported by the evidence because the record does not contain evidence showing improvement in the Plaintiff's communication after the April 2019 decision-making leave. It shows the contrary.

The Plaintiff fails to acknowledge that the decisionmakers, Link, Kopp, Smithers, and Horn, based their termination decision on the behavior, conduct, and communication issues that led to placing the Plaintiff on decision-making leave in the first place and that *continued after* she returned. First, on May 1, 2019, Kopp and Horn met with the Plaintiff to discuss: (1) a complaint about long wait times that patients were experiencing; (2) hiring, training, and onboarding decisions to remedy staff shortages; and (3) general concerns with how she was running her department. Second, a staff poll, taken in July 2019, showed that the Plaintiff's department continued to struggle under her leadership in key areas. For example, not all staff members felt (1) that they were being treated in a manner consistent with the Defendant's values; (2) that they were all held to the same performance expectations; (3) that there was confidentiality or sufficient training; and (4) that their manager and/or supervisor was supportive. Link, Kopp, Smithers, and Horn made the termination decision based on these May 2019 and July 2019 issues as well as the Plaintiff's prior performance issues.

Whether Link, Kopp, Smithers, and Horn were incorrect regarding the Plaintiff's behavior, conduct, and communication issues is not the test; rather, the question is whether they honestly believed that the Plaintiff had unresolved problems within the areas of behavior,

conduct, and communication. The Plaintiff has offered no evidence that Link, Kopp, Smithers, and Horn did not honestly believe the stated reason for her termination, that the reason was insufficient or implausible, or that there were contradictions in the Defendant's reason such that a reasonable person would not believe the explanation. The Plaintiff has not shown pretext because she has not identified "such weaknesses, implausibilities, inconsistencies, or contradictions" in the Defendant's stated reasons "that a reasonable person could find [them] unworthy of credence." *Id.* at 865 (quoting *Harper v. C.R. England, Inc.*, 687 F.3d 297, 311 (7th Cir. 2012)).

Thus, the Plaintiff has failed to raise a genuine dispute of fact that her protected FMLA activity was a motivating factor in the decision to terminate her employment. Since the Plaintiff presents no other arguments or evidence to support her FMLA retaliation claim, the Court grants summary judgment in favor of the Defendant on the Plaintiff's FMLA retaliation claim (Count IV).

## C.    Abandoned Claims

The Defendant also moves for summary judgment on the Plaintiff's remaining claims of interference under Title VII (Count IV), age discrimination and retaliation under the ADEA (Count II), and interference under the FMLA (Counts III and IV). In her response, the Plaintiff does not address these arguments or defend these claims in any way; thus, she has abandoned her remaining claims. *See Palmer*, 327 F.3d at 597 (concluding that a claim was abandoned when a party failed to defend it "in his district court brief in opposition to summary judgment"). Therefore, the Defendant is entitled to judgment on all the Plaintiff's remaining claims, including for interference under Title VII in Count IV, age discrimination and retaliation under the ADEA

23

in Count II, and interference under the FMLA in Counts III and IV of the Plaintiff's Amended Complaint.

## CONCLUSION

For the reasons set forth above, the Court hereby GRANTS Defendant Franciscan Alliance's Motion for Summary Judgment [ECF No. 40]. The Court DENIES as moot the Plaintiff's Motion for Judicial Settlement Conference [ECF No. 48]. The Court DIRECTS the Clerk of Court to enter judgment in favor of the Defendant Franciscan Alliance, Inc. d/b/a Franciscan Health and against the Plaintiff Alva E. Beardson on all Counts of the Amended Complaint. The Plaintiff takes nothing by her Complaint.

SO ORDERED on December 20, 2023.

 s/ Theresa L. Springmann
JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT